FILED

2006 May-18 PM 03:11
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **EDWIN L. EDWARDS, individually,** | ) | |
| **and ELL 12, LLC d/b/a** | ) | |
| **HUNTSVILLE KIA, an Alabama** | ) | |
| **Limited Liability Company,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No.  CV-05-S-1510-NE** |
| | ) | |
| **KIA MOTORS AMERICA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiffs, Edwin L. Edwards and "ELL 12," a limited liability company doing business as the Kia automotive dealership in Huntsville, Alabama, commenced this action for money damages and equitable relief against Kia Motors America, Inc. Plaintiffs' complaint asserts numerous violations of the Alabama Motor Vehicle Franchise Act, Ala. Code § 8-20-1 *et seq.* (1975) (Counts One through Six), as well as claims for fraud (Counts Seven and Eight), fraudulent suppression of material facts (Count Nine), breach of covenant of good faith and fair dealing (Count Ten), negligence and wantonness (Count Eleven), and negligent and wanton supervision (Count Twelve).[1]  Jurisdiction is founded upon the amount in controversy and the

---

[1] *See* doc. no. 1.

parties' complete diversity of citizenship.  *See* 28 U.S.C. § 1332(a)(1).  The action

now is before the court on defendant's motion for partial summary judgment.[2]

In diversity cases, the court applies state substantive law and federal procedural

and evidentiary rules.[3]  In that regard, Federal Rule of Civil Procedure 56 provides,

in the part pertinent to this discussion, that summary judgment "shall be rendered

forthwith if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(c).  Thus, "the plain language of Rule 56(c) mandates the entry of

summary judgment, after adequate time for discovery and upon motion, against a

party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at

trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and
> make all reasonable inferences in favor of the party opposing summary
> judgment.
>
> The mere existence of some factual dispute will not defeat
> summary judgment unless that factual dispute is material to an issue

---

[2] Doc. no. 9.

[3] *See, e.g., Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938); *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941); *National Distillers and Chemical Corp. v. Brad's Machine Products, Inc.*, 666 F.2d 492, 494-95 (11th Cir. 1982); *Johnson v. William C. Ellis & Sons Works, Inc.*, 609 F.2d 820 (5th Cir. 1980).

> affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting

*Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v.*

*Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

## PART ONE

### *Factual Background*

Kia Motors Corporation is an automobile manufacturer based in Seoul, South Korea, and it is the parent company of defendant, Kia Motors America, Inc. ("Kia").[4] Kia's principal place of business is located in Irvine, California, but the company conducts business throughout the United States, including the State of Alabama.[5]  It imports automotive products manufactured or approved by its Korean parent, and distributes the products through a network of authorized dealers operating at approved locations.[6]  The local dealers not only sell Kia's products, but also service the automobiles.[7]

---

[4] *See* information on Kia Motors Corporation, *available at* http://www.kia.com/info.php.

[5] *See* doc. no. 11 (Kia's evidentiary submission), Ex. 1, Declaration of David Richard Maxfield, ¶ 2 at 2.

[6] *See id.*, Ex. 2, Kia Dealer Sales and Service Agreement, at 1.

[7] *See id.*

Edwin Edwards approached Kia in 2002 about the possibility of obtaining a franchise in the region encompassing Auburn and Opelika, Alabama, and LaGrange, Georgia.[8]  According to Edwards, Kia agreed to award him a dealership in Opelika at a later date, *provided* he first purchased a struggling Kia dealership in Huntsville, Alabama.  Kia also promised Edwards that, if he later decided to sell the Huntsville dealership, it would find a purchaser.[9]  Edwards subsequently organized an Alabama limited liability company, plaintiff "ELL 12, LLC," to do business with Kia.[10]

Plaintiffs and defendant entered into a Dealer Sales and Service Agreement on August 21, 2002.[11]  ELL 12 was identified in the agreement as the "Dealer," and Edwards was identified as the exclusive "Owner" of that entity.[12]  The document specified that Kia executed the agreement in reliance upon ELL 12's representation that the "Owner" (*i.e.,* Edwards) was, among other things, "committed to the achievement of the purposes and objectives" of the franchise agreement.[13] However, the parties' relationship deteriorated within a year.

---

[8] *See* doc. no. 15 (plaintiffs' evidentiary submission), Ex. 8, Affidavit of Edwin L. Edwards, at unnumbered page 1.

[9] *See id.*

[10] *See id.*

[11] *See* doc. no. 11 (Kia's evidentiary submission), Ex. 2, Kia Dealer Sales and Service Agreement.

[12] *See id.* at 1, 2, 4.

[13] *See id.*, Ex. 3, Part II of Kia Dealer Sales and Service Agreement, at 6.

A few of the disagreements were documented in a letter mailed by Edwards to Kia on or about December 8, 2003.[14]  The letter identified six primary areas of dissatisfaction: (1) Kia was sending a large quantity of unpopular, slower-selling Kia models to his Huntsville dealership, but not sending sufficient numbers of the popular, faster-selling models; (2) Kia had failed to reimburse ELL 12 for warranty services performed by the dealership's mechanics; (3) Kia had failed to credit ELL 12 for sales of certain new vehicles; (4) Kia had failed to reimburse ELL 12 for advertising costs; (5) Kia had failed to award Edwards a dealership in Opelika, Alabama, as promised; and (6) Kia had failed to identify a prospective purchaser for the (still) under-performing Huntsville dealership, as promised.[15]

Edwards's complaints were reiterated the following month, in a January 9, 2004 letter drafted by Birmingham attorney John Martin Galese, who had been retained as counsel for ELL 12.[16]  Galese warned Kia that a lawsuit would result if the complaints outlined in Edwards's earlier letter were not addressed.[17]  Specifically, Galese stated:  "Do not misjudge the resolve or ability of my client to formalize its claims against you under the *Alabama Motor Vehicle Franchise Act*, for breach of

[14] *See id.*, Ex. 4, December 8, 2003 letter addressed to Percy Vaughn.

[15] *See id.*

[16] *See* doc. no. 11 (Kia's evidentiary submission), Ex. 5, January 9, 2004 letter addressed to Percy Vaughn and Peter Butterfield.

[17] *See id.*

5

agreement and for fraud, if no reasonable informal resolution of this dispute is forthcoming."[18]   An attorney for Kia responded to Galese on March 11, 2004, explaining the reasons why, in defendant's view, each of plaintiffs' complaints was without merit.[19]   Kia admitted no wrongdoing.[20]

Meanwhile, plaintiffs were operating the Huntsville dealership at a significant deficit.  The business suffered a net operating loss of $209,047 in 2002, and $405,690 in 2003.[21]   Edwards also believed that ELL 12 was owed hundreds of thousands of dollars from Kia for vehicle sales incentives, reimbursement of warranty service work, and advertising and marketing support.[22]   Due to these mounting losses, Edwards decided to sell the Huntsville dealership.[23]   He located a prospective purchaser, "Fletcher Automotive No. 18, LLC," but only after an exhaustive search.[24] A tentative agreement between ELL 12 and Fletcher Automotive was reached sometime in October 2004,[25] but under the terms of that agreement the sale of the Huntsville dealership had to be completed on or before the close of business on

---

[18] *Id.* at 2 (emphasis in original).

[19] *See id.*, Ex. 6, March 11, 2004 letter addressed to John Galese.

[20] *See id.*

[21] *See* doc. no. 15 (plaintiffs' evidentiary submission), Ex. 8, Edwards affidavit, at unnumbered page 3.

[22] *See id.*

[23] *See id.* at 2.

[24] *See id.*

[25] *See* doc. no. 11 (Kia's evidentiary submission), Ex. 1, Maxfield declaration, ¶ 9 at 4.

December 31, 2004.[26]

Edwards subsequently approached Kia for approval of the sale,[27] at which time he was presented with a "Mutual Release Agreement" ("the Release"). The Release identified three parties to the agreement: Kia, referred to as "KMA" (Kia Motors America, Inc.); ELL 12, LLC, identified as the "DEALER"; and the "DEALER OWNER," who was described as follows: "Edwin L. Edwards was at all material times the owner of DEALER ('DEALER OWNER(S)')."[28] The pertinent parts of the Release provide that:

> DEALER, DEALER OWNER(S) and KMA do, for themselves and on behalf of their respective employees, agents, legal representatives, officers, parent company, subsidiaries, affiliates, directors, successors, heirs and assigns, release, acquit and forever discharge one another of and from all claims which have arisen or may ever arise, demands and causes of action arising from, related to, or in any manner connected with the sale and service of Kia Products, including, without limitation, the Dealer Agreement, and from any and all claims for damages, related to or in any manner connected with the Dealer Agreement or the parties' business relationship[.]
>
> . . . .
>
> [I]t is understood and agreed that this agreement includes all claims of every nature in kind whatsoever, known or unknown, suspected or

---

[26] *See* doc. no. 15 (plaintiffs' evidentiary submission), Ex. 8, Edwards affidavit, at unnumbered page 2.

[27] The terms of the parties' franchise agreement stipulated that Kia's approval was necessary to finalize the sale. *See id.  See also* doc. no. 11 (Kia's evidentiary submission), Ex. 3, Sales and Service Agreement, at 20-21.

[28] Doc. no. 11 (Kia's evidentiary submission), Ex. 7, Mutual Release Agreement, at 1.

unsuspected, arising out of, in connection with, in consequence of, in any way involving, or related to, the Dealer Agreement or the business relationship between or among DEALER, DEALER OWNER(S) and KMA from the beginning of the world through and including the date of the Closing [*i.e.*, the closing of the sale of plaintiffs' Huntsville dealership to Fletcher Automotive].[29]

Edwards was reluctant to execute the Release, and sought legal advice.[30] Attorney Jeff Ingram, ELL 12's counsel at the time, directed correspondence to Kia, asking whether its approval of the sale was contingent upon plaintiffs' execution of the Release.[31]   The record does not specify the precise form of Ingram's correspondence, the date on which it was mailed, nor to whom it was addressed.  In any event, to the best of Edwards's knowledge, Kia never responded.[32]  In light of these circumstances, Edwards believed he was "left with no choice" but that of executing the Release,[33] even though he believed that Kia owed ELL 12 approximately $550,000 in reimbursements for vehicle sales incentives, warranty service work, and advertising and marketing support.[34]  Edwards was particularly worried about the looming deadline for closing the sale of the Huntsville dealership

---

[29] *Id.* at 1-2.

[30] *See* doc. no. 15 (plaintiffs' evidentiary submission), Ex. 8, Edwards affidavit, at unnumbered page 2.

[31] *Id.*

[32] *See id.*

[33] *Id.* at 3.

[34] *See id.*

to Fletcher Automotive.  In his words:  "Had Kia Motors not approved the asset sale to Fletcher and thus prevented ELL 12 from closing the deal by the December 31st deadline, ELL 12 would have become insolvent and been forced to file for bankruptcy."[35]

The Release was signed by Edwards on an unspecified date, first in his capacity as the "Manager" of ELL 12, but also as "DEALER OWNER(S)."[36]  There were four conditions precedent to the Release becoming binding upon the signatories:  (1) Kia had to expressly approve the sale agreement between ELL 12 and Fletcher Automotive; (2) Kia and Fletcher Automotive had to enter into a dealer relationship; (3) the Sales and Service Agreement between ELL 12 and Kia had to be terminated; and (4) the sale from ELL 12 to Fletcher Automotive had to close.[37]  All conditions were satisfied by January 4, 2005.[38]

Despite the terms of the Release, Edwards and ELL 12 commenced this action on July 13, 2005, prompting Kia to file the present motion for partial summary judgment.  Defendant contends that, with the exception of the claims asserted in

---

[35] Indeed, according to Edwards, ELL 12 had suffered net operating losses in the aggregate sum of $1,576,268 from 2002 to 2004, and Edwards had invested additional capital in the sum of approximately $600,000 above and beyond his initial investment, in an attempt to sustain the dealership's operations.  *See id.*

[36] Doc. no. 11 (Kia's evidentiary submission), Ex. 7, Mutual Release Agreement, at 3.

[37] *See id.* at 1.

[38] *See id.*, Ex. 1, Maxfield declaration, ¶ 12 at 4-5.

9

Counts Two through Four of the complaint,[39] plaintiffs' claims are barred by the terms of the Release.

## PART TWO

### *Discussion*

A written release of claims that are (or may become) the subject of suit, if supported by sufficient consideration, is enforceable under Alabama law. The Code of Alabama specifically provides that "[a]ll receipts, releases and discharges in writing . . . must have effect according to their terms and the intentions of the parties thereto." Ala. Code § 12-21-109 (1975) (2005 Replacement Vol.). The Supreme Court of Alabama has elaborated this statutory language, saying that, in the absence of fraud, a release supported by valuable consideration, and unambiguous in meaning, will be given effect according to the intention of the parties as determined by the court. *See, e.g., Jehle-Slauson Construction Company v. Hood-Rich, Architects and Consulting Engineering*, 435 So. 2d 716, 719 (Ala. 1983). Plaintiffs nevertheless assert several arguments in an attempt to salvage some or all of their claims. The court initially will address plaintiffs' statutory claims.

**A.**   *Alabama's Motor Vehicle Franchise Act*

---

[39] *See* doc. no. 10 (Kia's brief), at 2 n.1 (Kia states that it does not challenge the claims asserted in Counts Two through Four because those claims may fall within certain exceptions enumerated in the Release).

10

The Alabama Legislature passed the Motor Vehicle Franchise Act in 1981 for the purpose of balancing the bargaining power then weighed heavily against local dealers and in favor of foreign automobile manufacturers and distributors. *See Tittle v. Steel City Oldsmobile GMC Truck, Inc.*, 544 So. 2d 883, 887 (Ala. 1989). To that end, the Act defines those rights state automobile dealers may assert against auto manufacturers and distributors. *See* Ala. Code § 8-20-4 (manufacturers and distributors may not engage in unfair and deceptive trade practices), § 8-20-5 (manufacturer may not cancel, terminate, modify, fail to renew, or refuse to continue any franchise relationship with a dealer unless, among other things, the manufacturer has satisfied certain notice requirements, acted in good faith, and is able to articulate good cause), § 8-20-6 (manufacturer and distributor may not deliver new motor vehicles to dealer without prior notice to dealer of dealer's obligations), § 8-20-7 (among other matters, there must be reasonable compensation to the dealer for warranty services performed).

The Act's remedial provision, authorizing auto dealers to commence civil actions to enjoin and recover damages for violations of their statutory rights, provides that:

> *Notwithstanding* the terms, provisions, or conditions of any dealer agreement or franchise or *the terms or provisions of any waiver*, and

notwithstanding any other legal remedies available, any person[40] who is injured in his business or property by a violation of this chapter by the commission of any unfair and deceptive trade practices, or because he refuses to accede to a proposal for an arrangement which, if consummated, would be in violation of this chapter, may bring a civil action in a court of competent jurisdiction in this state to enjoin further violations, to recover the damages sustained by him together with the costs of the suit, including a reasonable attorney's fee.

Ala. Code § 8-20-11 (1975) (2002 Replacement Vol.) (emphasis supplied). Plaintiffs contend that they may assert claims under § 8-20-11 even when, as here, they have agreed to the terms of a release that is otherwise binding and enforceable. The crux of their argument is that the statutory term "waiver" encompasses the Release they executed when seeking Kia's approval of the sale of their Huntsville dealership.

**1.** *"Release" versus "waiver"*

It is a bedrock principle of statutory interpretation that, when determining the meaning of a statute, a court must first look to the plain meaning of the words used by the legislature. *See, e.g., Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004).

Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the

---

[40] A "person" is defined broadly under the Act as "[a]n individual, firm, partnership, association, joint stock company, corporation, or other legal entity or a combination of legal entities." Ala. Code § 8-20-3(12).

legislature must be given effect.

*Underwood v. Medical Clinic Board for the City of Montgomery*, 904 So. 2d 264, 267-68 (Ala. 2004) (internal markings omitted) (quoting *Blue Cross & Blue Shield v. Nielsen*, 714 So. 2d 293, 296 (Ala. 1998), in turn quoting *IMED Corporation v. Systems Engineering Associates Corporation*, 602 So. 2d 344, 346 (Ala. 1992)).

Unfortunately, the term "waiver" is "one of those words of indefinite connotation in which our legal literature abounds; like a cloak, it covers a multitude of sins." William R. Anson, *Principles of the Law of Contract* 419 (Arthur L. Corbin ed., 3d Am. Ed. 1919) (quoted in *Black's Law Dictionary* 1611 (8th ed. 2004)). *Compare*, *e.g.*, *Black's Law Dictionary* 1315 (defining "release" as meaning, among other things, "[t]he relinquishment or concession of a right, title, or claim") *with id.* 1611 (defining "waiver" as meaning the "voluntary relinquishment or abandonment – express or implied – of a legal right or advantage").

Even so, the defining distinction between the two terms lies in this cleavage: *release* is a term that describes a written agreement between at least two parties, by the terms of which one party surrenders or discharges a claim he, she, or it has against the other party;[41] whereas, the proper usage of the term *waiver* refers to an act that "is

---

[41] *See*, *e.g.*, 66 Am. Jur. 2d *Release* § 1 ("A release is a private agreement amongst parties which gives up or abandons a claim or right to the person against whom the claim exists or the right is to be enforced or exercised."); *Black's Law Dictionary* 1315 (8th ed. 2004) (defining *release* as, among other things, "[a] written discharge, acquittance, or receipt; specif., a writing – either under

unilateral in character, and one party acting alone who abandons his or her rights is sufficient to create waiver."  28 Am. Jur. 2d *Estoppel and Waiver* § 197.  *See also, e.g., Williston on Contracts*, § 39:24 at 599 (4th ed. 2000) ("It is well settled that a contracting party may unilaterally waive a provision of the contract.").

The most important evidence indicating that the Alabama Legislature did not intend the term "waiver" to be construed as encompassing a "release," however, is found within the four corners of the Motor Vehicle Franchise Act itself, which implicitly recognizes that the terms are not synonymous by using both words in the same section.  Section 8-20-4 — defining those acts that constitute unfair and deceptive trade practices — provides that it is unlawful for "any manufacturer, factory branch, factory representative, distributor, or wholesaler, distributor branch or distributor representative" to

> prospectively assent to a *release*, assignment, novation, *waiver*, or estoppel which would relieve any person from any liability or obligation under this chapter or to require any controversy between a new motor vehicle dealer and a manufacturer to be referred to any person other than the duly constituted courts of this state or the United States, if the referral would be binding on the new motor vehicle dealer; . . . .

Ala. Code § 8-20-4(3)(m) (1975) (2002 Replacement Vol.) (emphasis supplied). Thus, if the Alabama Legislature had intended the term "waiver" to be construed as

---

seal or supported by sufficient consideration – stating that one or more of the worker's contractual or compensatory rights are discharged").

14

meaning the same thing as a "release," the use of both terms in the foregoing statutory provision is redundant.

Redundancy, however, is abhorred in statutory construction. *E.g. Parker v. State*, 333 So.2d 806, 809 (Ala. 1976) (Jones, J., dissenting) ("Rules of constitutional and statutory construction abhor redundancy.") (citing *Carroll v. Alabama Public Service Commission*, 206 So.2d 364 (1968)). *See also Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 444 (1995) (Souter, J., dissenting) (joined by Chief Justice Rehnquist and Justices Scalia and Thomas) (stating the general rule that a statutory interpretation that renders an express provision redundant should be rejected).

This court accordingly concludes that Alabama's Motor Vehicle Franchise Act does not preclude enforcement of the parties' Release,[42] and summary judgment is due to be entered in favor of defendant on the claims asserted in Counts One and Five

---

[42] Analogous support for this conclusion is provided by another Alabama statutory scheme: the so-called "Tractor, Lawn and Garden and Light Industrial Equipment Franchise Act," Ala. Code § 8-21A-1 *et seq*. (1975), governing the franchise relationship between equipment manufacturers and distributors on the one hand, and Alabama dealers on the other. The remedial provision of that Act allows a state equipment dealer to bring a civil action against an equipment "supplier" for damages resulting from violations of the Act. *See id*. § 8-21A-8 (2002 Replacement Vol.); *see also* § 8-21A-2(4) (defining "supplier" as the "manufacturer, wholesaler, or distributor" of the equipment that is "to be sold by the dealer"). While the remedial provision of the Act does not discuss the effect (or the lack thereof) of waivers or releases, a specific provision in the Act does. Section 8-21-A-3(9) states: "It shall be a violation of this chapter for a supplier . . . . [t]o require the dealer to agree to a *release*, agreement, *waiver* or any other modification *that would relieve supplier or dealer from liability imposed by this chapter*." Ala. Code § 8-21A-3(9) (1975) (2002 Replacement Vol.) (emphasis supplied). By using the words "release" and "waiver" in the same provision, the Alabama Legislature demonstrated once again that it recognizes a distinction between the terms.

of plaintiffs' complaint.[43]

**B.**   *Plaintiffs' Common Law Claims*

The court now turns to the question of whether plaintiffs may continue to assert their claims for fraud (Counts Seven and Eight), fraudulent suppression of material facts (Count Nine), breach of a covenant of good faith and fair dealing (Count Ten), negligence and wantonness (Count Eleven), and negligent and wanton supervision (Count Twelve). Plaintiffs advance two arguments in an attempt to salvage these claims. They assert that Edwin Edwards, in his "individual capacity," was never a party to the Release; and, they argue that the Release was procured under economic duress and, therefore, is unenforceable. Both arguments are unavailing for the reasons discussed below.

**1.**   *Parties to the Release*

It is undisputed that Kia and ELL 12 were parties to the Release. The third party was the "dealer owner," identified in the agreement as follows: "Edwin L. Edwards was at all material times the owner of DEALER ('DEALER OWNER(S)')."[44] On the basis of this language Edwards asserts that (i) he agreed to

---

[43] The court recognizes that the defense of economic duress is relevant not only to plaintiffs' common law claims, but also to the claims based upon Alabama's Motor Vehicle Franchise Act. Even so, for those reasons discussed in Part Two, § B(2) *infra*, the defense must fail as a matter of law.

[44] Doc. no. 11 (Kia's evidentiary submission), Ex. 7, Mutual Release Agreement, at 1.

the terms of the Release only in his capacity as "dealer owner," and (ii) he now brings suit in his "individual capacity," which leaves him unfettered by the terms of the Release. The court declines to adopt Edwards's argument, as it requires a strained interpretation of the contract language. *See Williston on Contracts* § 31:5 at 304 (4th ed. 1999) (when interpreting a contract, the court may not limit the contract's effect by a strained construction). The court finds that Edwards was a party to the Release, and is bound by the terms of that agreement.

**2.** *Economic duress*

Alabama recognizes that a party may be relieved of contractual obligations upon a showing that he was compelled to execute the agreement that is sought to be disavowed by economic duress. *See, e.g., Wilson v. Southern Medical Association*, 547 So. 2d 510, 513 (Ala. 1989). The economic duress doctrine has three essential elements: "'(1) wrongful acts or threats; (2) financial distress caused by the wrongful acts or threats; [and] (3) the absence of any reasonable alternative to the terms presented by the wrongdoer.'" *Clark v. Liberty National Life Insurance Company*, 592 So. 2d 564, 567 (Ala. 1992) (brackets in original) (quoting *International Paper Company v. Whilden*, 469 So. 2d 560, 562 (Ala. 1985)). The Supreme Court of Alabama has emphasized, however, that

[t]he doctrine applies only to special, unusual, or extraordinary

17

situations in which unjustified coercion is used to induce a contract, as where extortive measures are employed, or improper or unjustified demands are made, under such circumstances that the victim has little choice but to accede thereto.

. . . .

The entering into a contract with reluctance or even dissatisfaction with its terms because of economic necessity does not, of itself, constitute economic duress invalidating the contract.   Unless unlawful or unconscionable pressure is applied by the other party to induce the entering into a contract, there is not economic compulsion amounting to duress.

*International Paper*, 469 So. 2d at 563 (citations and internal markings omitted).  *See also Clark*, 592 So. 2d at 567; *Newburn v. Dobbs Mobile Bay, Inc.*, 657 So. 2d 849, 852 (Ala. 1995).  Plaintiffs' defense fails at the first and third steps of this analysis.

      **a.**     "*Wrongful acts or threats*"

The first element of an economic duress defense requires a showing of "wrongful acts or threats" by the party imposing the contract sought to be disavowed. Plaintiffs complain that Kia fraudulently induced them to purchase a struggling Huntsville dealership by making two promises it never intended to keep:  if plaintiffs became dissatisfied with the Huntsville dealership, Kia would locate a new purchaser; and, plaintiffs later would be awarded a Kia franchise in or near Opelika, Alabama. Plaintiffs also assert that Kia refused to pay warranty claims, sales incentives, and advertising costs, and that they incurred additional losses as a result of Kia's decision

to dump slow-selling models on the Huntsville dealership.

Plaintiffs' complaints of fraudulent inducement, related to the original acquisition of the franchise for the Huntsville dealership, do not constitute "wrongful acts" for purposes of plaintiffs' economic duress arguments.  These alleged misrepresentations were not made in the context of negotiations leading to the sale of plaintiffs' Huntsville dealership to a third party and execution of the Release; rather, the representations were uttered, if uttered at all, at the time of negotiating the original franchise agreement.  *See International Paper*, 469 So. 2d at 563 ("Unless unlawful or unconscionable pressure is applied by the other party to induce the entering into a contract [*i.e.*, the Release], there is not economic compulsion amounting to duress.").  *See also Gruver v. Midas International Corporation*, 925 F.2d 280, 282 (9th Cir. 1991); *Gruver v. Midas International Corporation*, 1989 WL 1088, at *3 (D. Or. Jan. 4, 1989).

Kia's alleged failure to pay warranty claims, sales incentives, and advertising costs, and the losses sustained by the Huntsville dealership due to Kia's allegedly improper allocation of vehicle inventory, also do not constitute "wrongful acts" under an economic duress analysis.  Kia has never admitted these debts, or admitted any wrongdoing, and that fact is decisive.  A "threat to breach a contract or to withhold payment of an *admitted* debt *may* constitute a wrongful act." *International Paper*,

469 So. 2d at 563 (emphasis supplied) (citing *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Service Company*, 584 P.2d 15, 22 (Alaska 1978)).   *See also Northern Fabrication Company, Inc. v. UNOCAL*, 980 P. 2d 958, 960, 961-62 (Alaska 1999) (no wrongful act shown under the following circumstances:  the first party did not act improperly in obtaining a release, despite the fact that when the release was signed, the second party was in a difficult position financially, at least partially as a result of its contractual obligations with the first party); *id.* at 961 (distinguishing *Totem* as a case where one party to the release had "*deliberately* withheld payment of an *acknowledged* debt") (emphasis in original).  The "mere withholding of payment of a debt, without more, is insufficient to constitute economic duress." *International Paper*, 469 So. 2d at 563.

Plaintiffs also state in their brief that Kia's "employee, agent, and/or representative Tom Morgan made statements indicating that he intended to financially harm ELL 12's business."[45]  The court notes, however, that plaintiffs only cite their complaint as support for this assertion; Morgan's statement, or even a discussion of the statement, is not actually in evidence.  *See* Fed. R. Civ. P. 56(e) (when the party moving for summary judgment has discharged its initial burden, the party opposing summary judgment must go beyond the pleadings, to demonstrate by affidavit or

---

[45] Doc. no. 24 (Plaintiffs' Corrected Brief), at 18.

other appropriate means that there is a genuine issue of material fact for trial).

Finally, the attorney for ELL 12 directed correspondence to Kia during plaintiffs' deliberation over the terms of the Release. Kia did not respond. Plaintiffs wisely do not contend that Kia's failure to respond was a "wrongful act" for purposes of the economic duress analysis. It was not.

### b.    *"Reasonable alternative"*

Plaintiffs also have failed to satisfy the third element of an economic duress defense, which requires a showing of "the absence of any reasonable alternative to the terms presented by the wrongdoer." Plaintiffs contend that filing a lawsuit, in lieu of signing the Release, was not a "reasonable alternative" under the circumstances. The court accepts this contention for purposes of discussion. *See Northern Fabrication Company*, 980 P.2d at 961 (a reasonable jury could conclude that plaintiff had no reasonable alternative to signing a release, when an alternative would have been to initiate litigation, but ensuing delay would have meant sure bankruptcy for plaintiff); *Rich & Whillock, Inc. v. Ashton Development, Inc.*, 157 Cal. App. 3d 1154, 1158 (Cal. Ct. App. 1984) (observing that a reasonably prudent person subject to "wrongful acts" "may have no reasonable alternative but to succumb when the only other alternative is bankruptcy or financial ruin").

Even so, after being presented with the terms of the Release, ELL 12's counsel

21

directed correspondence to Kia, asking whether approval of the sale of the Huntsville

dealership was contingent upon plaintiffs' execution of the Release.  There was no

response.  While plaintiffs contend they then had no "reasonable alternative" but that

of consenting to the terms of the Release, this court disagrees.  Plaintiffs could have

reiterated their inquiry, more forcefully if necessary, or they could have sought to

negotiate the terms of the Release.  They did neither.

Accordingly, on the two independent bases identified above, the court

concludes that plaintiffs' defense of economic duress must fail.[46]  Plaintiffs' common

law claims are barred by the terms of the parties' Release, and summary judgment is

due to be entered in favor of defendant.

**C.**    *Abandoned Claim*

In Count Six of the complaint, plaintiff Edwin Edwards sought to challenge the

prospective operation of Kia's wholesale vehicle allocation system.  Edwards brought

this claim for equitable relief under that provision of Alabama's Motor Vehicle

Franchise Act which prohibits a distributor from implementing a plan or system that

allocates motor vehicles to local dealerships in an arbitrary, capricious, or

---

[46] Plaintiffs also represent that more discovery may be required to bolster their defense of economic duress, and until such discovery is completed, Kia's motion for partial summary judgment should be denied.  The court notes that plaintiffs have failed to present a proper motion for additional discovery under Rule 56(f) of the Federal Rules of Civil Procedure.  *See Harbert International, Inc. v. James*, 157 F.3d 1271, 1280 (11th Cir. 1998).

unreasonably discriminatory manner.  *See* Ala. Code § 8-20-4(3)(a).  Kia moved for

summary judgment on the ground that Edwards lacks standing to assert the claim.

Edwards conceded the issue in his briefs.[47]

**PART THREE**

*Conclusion*

On the basis of the foregoing, all aspects of defendant's motion for partial

summary judgment are due to be granted.  An appropriate order will be entered.

DONE this 18th day of May, 2006.

_____

United States District Judge

---

[47] *See* doc. no. 24 (Plaintiffs' corrected brief), at 10 n.1; doc. no. 43 (Plaintiffs' supplemental brief), at 10 n.3.